MONTGOMERY *et al. vs.* THE TRUSTEES OF THE MASONIC HALL IN THE CITY OF AUGUSTA, AND *vice versa.*

[This case was argued at the last term, but was ordered re-argued at the present term.]

1. The defendants, under the facts of this case, had a perfect prescriptive title to the lot on which they pulled down the wall involved in controversy. The plaintiffs had no estate in remainder, but held under the will of their mother; if the possession of defendants was adverse to her and her trustees, it was adverse to plaintiffs.

(*a.*) An ante-nuptial agreement provided that certain property of the wife should be conveyed by the intended husband to trustees for her; that she should have power to make a will, and in case her husband should survive her, the trustees should convey and dispose of the said lots or parcels of land as the said wife might by her will appoint, the disposition to take effect as to one-half of the lots immediately after her death, and as to the other half after the death of her husband; should she survive her husband, "said trustees, and their successors, shall hold the said lots or parcels of land for the use and benefit of (the wife) during her lifetime, and not to be disposed of, aliened or conveyed, by mortgage or deed, or in any other way, but by will, and for the use, maintenance and education of her issue and their descendants in such manner as the said (wife) may and shall direct." If the wife died intestate, provision was made as to the disposition of the property:

*Held,* that in case the husband survived, the wife had power to devise the property, subject to a life use of one-half by him; if she survived, her right of disposition was absolute; in neither case was her right to devise limited to certain beneficiaries marked out by the settlement. To so hold would destroy all her testamentary power.

(*b.*) The meaning of the clause in regard to the maintenance and education of her issue and their descendants, is that the trustees should hold the property for her use, and for the use of her children and descendants during her life as she might then direct; they did not limit her power of disposition by will.

(*c.*) The husband could not alter this power by post-nuptial deed; nor was it done; the deed substantially followed the settlement; and a provision therein that the wife should have power to make a will "in pursuance of the provisions of this settlement, and of the precedent covenant," will be construed to refer to the rights of the husband in case of his survivorship.

2. The defendants held by prescription—adverse possession for more than fifty years—which presumes a grant to them from the state.

The plaintiffs claimed under the will of their mother, and the two sides did not derive title from a common grantor.

(a.) Owners of adjoining lands owe to each other, as incident to their juxtaposition, the lateral support of each to that of the other in its natural state, whether they derive title from a common grantor or not. If they derive title from a common grantor, that lateral support extends further than the soil in its natural condition, and embraces the superincumbent weight that may be upon it by fence, wall or other burden. If, at the time the common grantor parts with title, there are buildings adjoining each other, the right extends to the lateral support which each adjacent wall gives to the. other.

(b.) If there be between the two proprietors a party wall supporting the timbers of each, the right of each to that wall for the support it gives his building is that of a tenant in common with the other, and neither can change it so as to displace the timbers of the other so supported, or in anywise injure or make them insecure.

(c.) A deed from the husband or the trustees of the wife in this case, would be nothing more than color of title, there being no power in either of them to convey the property.

3. The question of diligence in removing the wall, from which the damage arose, was one of fact; it has been submitted to the jury, and their finding was supported by the evidence.

4. The admission or rejection of the testimony of the witness, Gould, or of the minutes of the Masonic lodge, was immaterial, under the. views just announced.

5. A failure to give notice to an adjoining land owner of the removal of a wall will not necessarily show negligence; if the adjoining land owner, from personal observation or otherwise, had knowledge that the work was being done, or would be done, the object of giving notice would have been accomplished; and such facts could be considered by the jury in determining the question of diligence.

(a.) There was no such substantial error committed as requires a new trial on behalf of the plaintiffs.

September 1, 1883.

Title. Prescription. Husband and Wife. Wills. Easements. Damages. Estates. Before Judge LAWSON. Richmond Superior Court. April Term, 1882.

Plaintiffs, the Montgomerys, brought case against the Trustees of the Masonic Hall for damages done to a wall of the plaintiffs. The facts were, in brief, as follows: In 1824, an ante-nuptial agreement was entered into between General W. W. Montgomery, Augustus Moore.

guardian, and Miss Janet S. Blair, as precedent to the marriage of General Montgomery and Miss Blair. In this agreement it was provided, among other things, that the husband should settle upon trustees certain property which she had. She was to have a certain amount paid to her annually from the rents; she was given the right to make a will; and in case she survived her husband, the trustees were to convey and dispose of the lots as she might direct by will, to take effect as to one-half at once upon her death, and as to the other half upon the death of her husband, who was given a life-use in the latter half. If she survived him, the agreement provided as follows:

"And in further trust, that should the said William W. Montgom-ery depart this life before the death of the said Janet S. Blair, the said trustees, and their successors, shall hold the said lots or parcels of land for the use and benefit of Janet S. Blair during her lifetime, not to be disposed of, aliened, or conveyed by her by marriage,[mortgage?], deed, or in any other way than by will, and for the use, maintenance and education of her issue and their descendants in such manner as the said Janet S. Blair may direct."

The post-nuptial settlement substantially followed the ante-nuptial agreement, and contained the following clause:

"And the said William W. Montgomery hereby authorizes and empowers the said Mrs. Janet S. Montgomery, late Miss Janet S. Blair, to make a last will and testament in pursuance of the provisions of this settlement, and of the preceding covenant."

Mrs. Montgomery survived her husband and died testate, leaving all her property to the plaintiffs in this case. A part of the property covered by the ante-nuptial and post-nuptial contracts was lot number 34, on Broad street, in Augusta, Ga. Such was the title of plaintiffs.

The trustees of the Masonic Hall, in the city of Augusta, were incorporated in 1827. They bought lot number 33, just west of the Montgomery lot, and desiring ten feet more front, authorized a committee to purchase a strip ten feet wide on the opposite side of the Montgomery lot, and exchanged it with General Montgomery for a like strip lying contiguous to their lot; they obtained posses-

sion of the strip at a cost of $1,700.00. A notice to produce the deed from Montgomery to the Trustees of the Masonic Hall, and a bond for title covering this strip, was served by plaintiffs, but the papers could not be produced. The trustees went into possession in 1828, and have been in open, continuous, peaceable and adverse possession ever since. In 1828, they entered into a contract to have a building erected on their lot, including the ten feet which had been added thereto, which was done. There had previously been buildings on the Montgomery lot, but they had burned in 1827. After the sale, a wall was built on the Montgomery lot along the eastern line of the ten feet slip and "flush" with it, and having no "footing" to the west of it. This wall was run up one story, temporarily stopped, and subsequently completed. The plaintiffs have utilized the ten feet received by them on the east of the Montgomery lot.

In 1881, the Trustees of the Masonic Hall tore down their eastern wall for rebuilding. When left to stand alone, the Montgomery wall "bulged" to such an extent that the fire wardens of the city required it to be taken down as unsafe. The trustees, in taking down their wall, dug "flush" with the Montgomery wall, but no dirt fell from that side. The evidence for the defense showed that the defendants never went lower than the Montgomery wall except in two places, in order to make their foundation level; that there were inherent defects in the plaintiffs' wall, and that its foundation never sunk. Plaintiffs claimed that defendants had dug below their wall, and that the injury resulted therefrom. One of the plaintiffs saw that work was being done on the Masonic Hall, and cautioned the contractor to be careful as he approached the foundation of the two buildings.

In tearing down defendants' wall, the evidence for the defense showed that the contractor discovered that the Montgomery wall leaned upon it and began to "bulge" on the removal of the support, before reaching the foun-

dation. He proceeded, however, with the work until he had gone two or three feet below the surface of the ground, when he suspended work for a day or two, and then proceeded, under instructions from the architect. During the taking down of defendants' wall, a hole was discovered in the Montgomery wall, and W.W. Montgomery, one of plaintiffs, contracted to have it filled. After the taking down of the wall below the surface of the ground, Montgomery was told by a Mason that he should look after his wall. He was on his way to the depot to leave the city, but drove to the place, was told by the contractor that he did not think there was danger, and left. He was recalled in a day or two by a notice of danger from one of his tenants and another one of the plaintiffs. No notice was given to plaintiffs of the intended improvements.

There was some other testimony not necessary to detail.

The jury found for the defendants. Plaintiffs excepted, and assigned the following among other errors:

(1.) Because the court charged to the effect that if plaintiffs received the ten feet on the east of their lot in exchange for the ten feet held by the trustees, held it and exercised ownership over it, and still do so, they would be estopped from denying the title of defendants.

(2.) Because the court charged that defendants "had a right to remove their wall, in the event they proceeded about it in a careful manner. All persons have a right to use their own property in any manner they see proper, provided they use it in such manner as not to unlawfully damage the property of others."

(3.) Because the court charged, in effect, that as to property coming from a common grantor, there was a right to lateral support of the soil, and also of such structures as might at the time have been on the soil; but that if no injury resulted from the removal of lateral support, but from other causes, such as inherent defects in the building, there could be no recovery.

(4.) Because the court charged that plaintiffs "had no

right to have their wall rest above the ground on the wall ·of defendants;" but the latter would be bound in remov-·ing their wall to use due care not to damage their neighbors, if they could prevent it without extraordinary expense.

(5.) Because the court admitted the books of minutes ·of defendants, plaintiffs objecting that they could not bind ·others than members of the corporation.   W. T. Gould was also admitted as a witness to prove the correctness of the statements on the minutes as to the exchange of lots, ·over objectión becáuse General Montgomery was dead, .and Gould was an agent of the corporation.

(6.) Because the court refused to charge to the effect ·that defendants were bound to give reasonable notice of their ·intended improvements to plaintiff, but charged as follows : ·" The court does not charge you that it was necessary for the defendants, in constructing their wall, to give notice. .If they failed to give notice, that is one circumstance from ·which you must determine whether negligence is imputa-·ble to them in removing their wall.   *   *   *   If you find that the defendants did not use ordinary care and diligence, taking into consideration whether or not the plaintiffs did have notice by their own personal observation. or other-·wise, of the work going on or intended to be done; taking ·into consideration all circumstances to determine the dili-·gence and care which characterized the conduct of the ·defendants; taking into consideration all the circumstances; ·if you find that there was diligence—ordinary diligence, ·ordinary skill—exhibited on the part of the defendants, you would then find for the defendants in this case."

J. S. Hook; Barnes &· Cumming; W. W. Montgomery, for Montgomery *et al.*

F. H. Miller; J. S. & W. T. Davidson, *contra.*

Jackson, Chief Justice.

The Montgomerys, as tenants in common of certain ten·.ements ·on Broad street in the city of Augusta, brought

suit against the Masonic Lodge, of that. city, to recover·
damages for the unlawful pulling down of a wall ad-
,joining a wall belonging to a building of the Montgom-
erys, by which the latter were forced to take down their
own. The jury found for the defendants, and, without
making a motion for a new trial, the plaintiffs excepted to·
certain rulings of the court on the trial before the jury.

1. One. of the points made by the plaintiffs in error is,.
that the Masons had no .title to the lot on which the wall
which. they pulled down rested, and were mere trespassers,
and are, therefore, liable to respond in damages to the plain-
tiffs, having no right, whatever, to touch either wall at all,.
much less to tear one down to the damage of the plaintiffs..
So that the first question is, in whom, under the facts, is.
the title to the Masonic lot, and the building thereon?

The court below ruled to the effect that, under the facts,
the Montgomerys were estopped from denying the title of
the defendants to this lot, and exception is taken to that.
ruling.

In our view of the law of the case, it is wholly im-
material whether that ruling be right or wrong. The Ma-
sons held perfect title against the world by prescription.
From 1828 up to .this moment, they have been in the
quiet, peaceable, undisturbed and adverse possession of·
the tenement. This gives title by prescription, without
regard to any written color of title whatever. 64 *Ga. R.*,,
. 370.

The Montgomerys had no estate in remainder, vested or·
contingent. They hold under their mother's will. There-
fore, if she had no title against this long possession, they
had none. If the Masons' possession was adverse to her,.
it was adverse to them. Or, if adverse to·her trustees,
who held the legal title, it was to them. By the ante-
nuptial and post-nuptial agreements between the father·
and mother of the plaintiffs, the ·mother's right to devise·
the property to whomsoever she chose at her death is.
.clearly given. , If she died intestate, then .it was to go in

a certain way; but if she died testate, her husband sur viving, then it was to go as she directed by will, subject, in that case, to certain reservations in his behalf. If she survived him, then her right to dispose of it by her will is without limitation or restriction. She did survive him, he having died in 1843 and she in 1880.

It is true that the learned counsel for the plaintiffs argued for a different construction of the marriage settlements, insisting that she was to devise the property by will only in a certain channel, and precisely as it would have gone by the settlements without a will; in other words, that the settlements gave her only a power to convey by will, exactly as they previously dictated. We cannot see it in that as the legal view. All her power to act by will and to have her way and will, in regard to her property at her death, is mere surplusage, and wholly without volition on her part, if she must will it in a certain way, as was already prescribed in the settlement. It was her property. Before her marriage, her intended husband relinquished his marital rights, and agreed to convey the property, after marriage, in trust for her, with certain limitations, but with her right, she surviving him, to do as she chose with it by will. If he survived her, then her will was not to go into effect as to one-half until his death. The language used in the ante-nuptial settlement is, that the trustees are to " convey and dispose of the said lots or parcels of land as the said Janet S. Blair may by her will appoint; the conveyance and disposition shall take effect as to a moiety or one-half of said lots or parcels of land immediately after the death of the said Janet S. Blair, and as to the other moiety or one-half, immediately after the death of the said Wm. W. Montgomery." This is the provision in case the husband survive the wife. But if she survive, the trustees are to hold the entire property " for the use of the said Janet S. Blair during her life-time, not to be disposed of, aliened or conveyed by her, by marriage, deed, or in any other way than by will, and for the

use, maintenance and education of her issue and their descendants, in such manner as the said Janet S. Blair may direct."

We do not think that these last words, in respect to the use of the descendants, limit the scope of her will-power, construed in connection with the paragraph in regard to her will, if the husband survived her. In that case, no restriction is put upon her will, except that one-half of the property is to remain to the use of the husband for life. It would be strange if, in the latter event, she surviving him, she should have less power. The meaning of the words in respect to issue and descendants, is that the trustees are to hold the property for her use and for the use of her children and descendants during her life, as she may direct in her life-time. The word "education" is potent to show that this is the meaning.

The post-nuptial deed could not alter the ante-nuptial agreement, but it really follows substantially the antenuptial in respect to the provision where the husband survives, and where the wife survives also, containing, however, these additional words: "And the said Wm. W Montgomery authorizes and empowers the said Mrs. Janet S. Montgomery, late Miss Janet S. Blair, to make a last will and testament in pursuance of the provisions of this settlement and of the precedent covenant."

The object of this limitation, as we think, was to guard the interest of the husband in the event he survived the wife, and to debar her from the right to make a will other than is in accordance with that covenant; and this clause does not, and could not, alter the legal effect of the ante-nuptial agreement and its provisions repeated in the post-nuptial settlement.

Such was the construction put on the settlements by Mrs. Montgomery, who disposed of it by will, without regard to any remainder estate in anybody. Such was the construction put upon it by the plaintiffs in this action, two of whom executed the will and assented to the legacies, and all of whom took and claimed under it.

Meaning must be given to her power to dispose of the property at her death by will. If the *corpus* is already disposed of by the settlements, and is to go to the children in the exact manner they direct, there will remain no disposition of the property, as she wills it to go at the time she makes a will, in contemplation of her death.

The entire scheme of the settlements is that the wife, whose was the whole property prior to marriage, should have an annual support of six hundred dollars of the income in preference to every claim, except repairs; then the balance of the income is to be enjoyed by her husband and herself during their lives; then, if she died before him, he was to enjoy half the income until his death, she to dispose of the whole *corpus* by will, but that will not to affect the moiety to his use until his death; but if she survived (as she did), then she was free to dispose of it all as she chose. There is no direction that she shall will it to the children at all, neither as tenants in common, nor in any other manner. She cannot dispose of the *corpus* in any manner at all, except by will; but for the use, maintenance and education of the children, under her direction alone, the trustees could have disposed of the usufruct, and in cases of emergency, perhaps, of the *corpus*. The precise language of the post-nuptial deed, in respect to the contingency of her surviving her husband, which did occur, is that the trustees "shall hold the said lots or parcels of land for the use of the said Mrs. Janet S. Montgomery, late Miss Janet S. Blair, during her life-time, not to be disposed of, or aliened or conveyed by her, by marriage, or deed, or in any other way but by will, and for the use, maintenance and education of her issue and their descendants, in such manner as the said Mrs. Janet S. Montgomery, late Miss Janet S. Blair, may and shall direct." The property is to be held by them for her use and the use, maintenance and education of the children during her life, as she may direct, with the right in her to give it by will as she chose after her death. The words, " and for

the use, maintenance and education of her issue," etc., must follow and be construed with the prior words, "for the use of the said Mrs. Janet S. Montgomery," etc., "during her life-time." The words respecting the issue, as well as herself, apply to the trustees holding the estate for her life-time, at the termination of which the trust was also executed, the husband being dead and the will made. And, as remarked before, the word "education" shows that this is the true meaning. If it be replied that "descendants" is too extensive a word to be limited to a life, it may be answered, that unless limited, it is illimitable here, and the other construction might make the equitable estate descend forever to the issue and descendants of issue of Mrs. Montgomery, and put the equitable fee in her.

The clause following empowers Mrs. Montgomery "to make a last will and testament in pursuance of the provisions of this settlement and of the precedent covenant," which means, as we think, the covenant that the will is not so to operate, if the husband should survive as to dispose of his usufruct of one-half the estate during life. No estate in remainder is put in the issue by this settlement; and we are clear that the construction put upon it by Mrs. Montgomery and her children, including the very able counsel who represents them all here, is correct and should stand. We conclude, then, without invoking the doctrine of estoppel, which would unquestionably apply, if as the admitted evidence shows, the Montgomerys got another lot of equal size from the Masons in 1828, and have built upon and occupied it ever since, that the title by prescription to the Masonic lot is perfect in the Masons without regard to any deed at all from General Montgomery; and hence that the court was right in so far as it charged the jury that the plaintiffs could not recover on the counts which set up title in themselves to the Masonic lot.

2. This strips the case of any conflict of title to the *corpus* of the property. The plaintiffs insist, however, that inasmuch as both parties did derive title from General Mont-

gomery,. a common grantor, therefore they acquired an
easement to the support of their wall by the adjoining soil
of the Mason building. That depends on the question
whether they did hold under a common grantor? We have
seen that the Masonic lodge holds by prescription—adverse
possession for fifty odd years—which presumes a grant to
them from the state. They hold, then, by grant from the
state, and the Montgomerys under the will of their mother
—totally distinct titles and different grantors.

The law is that the owners of adjoining land owe to each
other, as incident to their juxtaposition, the lateral sup-
port of the soil of each to that of the other, in its natural
state, whether they derive title from a common grantor or
not. If they derive title from a common grantor, then that
lateral support extends further than that of the soil in its
natural condition, and embraces the superincumbent weight
that may be upon it by fence, wall or other burden. If
at the time the common grantor parts with title, there be
buildings adjoining each other, then the right extends to
the lateral support which each adjacent wall gives to the
other. If there be between the two proprietors a party
wall—that is, a common wall between them, supporting the
timbers of each—then the right of each to that wall for the
support it gives his building is that of a tenant in common
with the other, and neither can touch it so as to displace
the other's timbers therein supported, or in anywise injure
or make them insecure.

The above summary of the law will be found fully sup-
ported by Washburn on Easements and Servitudes and
numerous cases there cited in chapter IV, sections 1, 2 and 3.

There is no pretence of any party wall here in the case at
bar; none, that if there had been a common grantor, build-
ings had been erected when he parted with title; but the
pressure urged by counsel is, that there was a common
grantor; that both parties hold under General Montgomery,
and that the plaintiffs are entitled to the lateral support of
the soil of the Masonic lot, not only for the soil of their lot

as it was when the Masons bought, but with the superincumbent weight put on it afterwards. So that the point, whether or not there was a common grantor, is vital.

In no conceivable view of the testimony disclosed in the record do the parties hold under a common grantor. The one holds by prescription—grant from the state ; the other from Mrs. Montgomery under her will.

It is replied, however, that it is recited in a deed drawn by notice from defendant, that it holds under General Montgomery, and that the presumption of grant from the state is thereby rebutted, and thus each party holds under him. But the facts also show that General Montgomery had no title to convey to the Masons, and thus granted them nothing. So far as he had any title, he had granted it away to trustees for his wife, and he had none left to grant to the defendants. But he never had any for a moment, except subject to an ante-nuptial agreement, which bound him to make a deed pursuant to that agreement, and which agreement utterly annihilated his marital rights and prohibited him from asserting title. That agreement could have been enforced at any time by Mrs. Montgomery, and was itself evidence of her title free from his marital rights.

So that the deed by Montgomery, if there was one, was mere color to support prescription, and the prescriptive title is the title of the Masons.

And even if the trustees had made the title to the Masons, the marriage settlement gave them no such power, and their deed would have been mere color to support prescriptive title. Therefore, in any view of the case, the title of the Masons rests in prescription, and that of the plaintiffs by purchase under their mother's will ; and there is no common grantor in the case.

3. The question of fact, whether or not the wall was taken down carefully or negligently so as to disturb the soil on which the Montgomerys'. wall rested, was settled by the jury ; there is no motion for a new trial on the ground that the verdict is decidedly against evidence ; if there was, we

would not disturb the verdict, as, to say the least, it is supported by evidence.

4. It is thus apparent from the views presented above, that it is wholly immaterial whether Judge Gould's testimony was admitted or rejected, or whether the minutes of the Masonic lodge were properly in evidence or not. The admission of either neither helped nor hurt either party.

5. The court declined to charge that failure to give notice entitled plaintiffs to recover without more; but charged that " if they failed to give notice, that is one circumstance from which you must determine whether negligence is imputable to them or not." And again, "If you find that the defendants did not use ordinary care and diligence, taking into consideration whether or not the plaintiffs did have notice by their own personal observation, or otherwise, of the work going on or intended to be done; taking into consideration all circumstances to determine the diligence and care which characterized the conduct of the defendants; taking into consideration all the circumstances, if you find there was diligence—ordinary diligence, ordinary skill—exhibited by defendants, you would then find for the defendants."

We do not see material error in this view of the law applicable to this case. Circumstances developed by the testimony point to substantial notice or knowledge of what was going on and the condition of things, while formal notice may not have been given. The object of the notice is, that the party may have knowledge of what is going on, of the fact that the wall is being pulled down. The plaintiffs had that knowledge, and that is notice.

In the view we have taken of this case, after much deliberation, we see no such substantial error as demands a new trial in order to further the ends of justice. On the contrary, the law of the case seems to us plainly against the plaintiffs, and they have taken no issue with the jury on the facts.

There is no party wall in it; there is no doctrine of the

law in the case of the rights of proprietors of adjoining lots where a common grantor deeds tenements standing or lands adjoining each other applicable to the facts of this case. So that the case of Henry *vs.* Rock, decided by the Kentucky court of appeals, October 3, 1882, and cited by plaintiffs in error, has no application. The ruling there is: "Purchasers of adjoining houses from a common owner are presumed to contract with reference to the condition of the property at the time of the sale, and when the house of one purchaser is supported by a wall on the lot of the other, the right of the former to the use of the wall for the support of his house is an easement, with the enjoyment of which the owner of the lot on which the wall stands has no right to interfere by tearing away the wall or so altering it as to injure his neighbor's house." This is good sense and seems sound law, but wholly inapplicable where there is no common owner and no houses sold. And so equally inapplicable is all the law touching the rights of purchasers from a common owner or grantor; for the reason that in our view of the facts there is no common owner or grantor on whose title both parties stand in this case.

Judgment affirmed.